# CHARLESTON.

ACCIDENT INSURANCE COMPANY v. SECRETARY DAWSON.

Submitted April 15, 1903.   Decided May 16, 1903.

1. FOREIGN ACCIDENT INSURANCE COMPANIES.

A foreign accident insurance company is not required to comply with section 2, chapter 34 of the Code, and get its certificate to do business in this State from the Auditor, but gets its certificate from the Secretary of State undes' section 30, chapter 34 of the Code, upon complying with the latter section. It is not required to file a writing accepting the provisions of section 30 and agreeing to be governed thereby. (p. 620) .

Petition of the Virginia Accident Insurance Company for writ of *mandamus* to W. M. O. Dawson, secretary of state.

*Writ Granted.*

RUCKER, ANDERSON and HUGHES, for petitioner.

BROWN, JACKSON and KNIGHT, for respondent.

BRANNON, JUDGE:

The Virginia Accident Insurance Company, a Virginia corporation, desiring to do business in this state, filed with the secretary of state, 7 March, 1903, a copy of the certificate of its corporation, and requested the Secretary of State to issue to it a certificate of the fact as provided in section 30, chapter 54 of the Code as it appears in chapter 35, Acts of 1901, p. 108; but the secretary refused such certificate and the company asks from this Court a *mandamus* requiring the Secretary to issue such certificate in order that it may carry on its corporate business in this State. The company's petition states that it engages in the business only of insuring persons against bodily injury sustained through external, violent and accidental means only; that it issues but one form of policy; that in case of accident to one of its assured, it is bound by its policy to pay him $7.00 per week during disability for a period not exceeding 26 weeks; that in case of death within sixteen weeks after the injury, the company would pay $60.00 to the representative of the assured; that under one policy the liability could not exceed $182.00; that its policy assumes risk for only one month at a time, and lapses in default of premium, which is one dollar per month. The return of W. M. O. Dawson, secretary of state, to the *mandamus nisi* awarded by this Court presents for our consideration two reasons why the *mandamus* should not go; first, that petitioner is a foreign insurance company and as such must get a certificate, not from the secretary of state, under section 30, chapter 54, code, but from the Auditor under another statute, section 2, chapter 34; and second, that if the secretary is to issue a certificate, the company had not fully complied with section 30, chapter 54, as it did not, in addition to filing the certificate of incorporation, also file a writing accepting the provisions of section 30 of chapter 54 of the Code, and agreeing to be governed thereby.

The case involves only the construction of our statute law pertinent to the subject. Does the certificate to enable the petitioner as a foreign corporation to do business in this state emanate from the secretary of state under section 30, chapter 54, Code, or from the auditor under section 2, chapter 34, Code 1899? That depends on the question whether an accident in-

surance company is an insurance company within the meaning of section 2, chapter 34. If it is then the petitioner is not entitled to a certificate from the secretary of state at all, but its certificate must come from the Auditor. On the other hand, if this company is not an insurance company within the meaning of section 2, chapter 34, then its certificate comes from the secretary of state, if it has fully complied with section 30, chapter 54 of the Code. Chapter 34 concerns insurance, telegraph and express companies generally by its title and by numerous detailed provisions as to terms upon which they shall operate, their taxation, service of process on them and their liability. Section 1 as found in chapter 107, Acts 1901, says that every insurance, telegraph, telephone or express company having its principal place of business in this state incorporated by Virginia before 20th June, 1863, or by this state shall be a domestic corporation; all others foreign. This provision is applicable to all insurance, telegraph, telephone and express companies. It distinguishes foreign from domestic corporations for general purposes of that chapter or any other, because there be certain provisions applicable to the one, and not to the other, and this section gives the test as to whether such a corporation is domestic or foreign for general legal purposes. It is applicable to all; but when we come to section 2, we find it limited to particular corporations, reading: "It shall not be lawful for any officer, or agent of any life, fire or marine insurance company, directly or indirectly, to take risks or issue policies of insurance within the State, without first procuring from the auditor a cirtificate as hereinafter directed. Before obtaining such certificate, such company, its officers or agents, shall furnish the auditor with a statement under oath of the president or secretary of the company, for which he or they may act, which statement shall show:

*First.* The name and locality of the company," and ten other items of the statement "which statement shall be filed in the office of the said Auditor." Clearly this language is limited to "life, fire and marine insurance" companies. It does not include, but by implication excludes, accident insurance companies. Such its words. Do not these words mean what they import? Though only the words "life, fire or marine insurance" are used, do they have a broader meaning and include accident

insurance—any insurance company? Do they include imploy-ees' Liability Insurance, or Fidelity and Guarantee Insurance, or Title Insurance, or Live Stock Insurance, or Boiler or Glass Insurance? Will those words open to take in every new species of insurance that may come in the mutation of business in future? I think not. But it is so argued, virtually. Let us go back to see whether these three words, "life" "fire" "marine," were sedately chosen. An act passed in 1867 (chapter 117) laid a tax on "all insurance companies establishing agencies or doing business in this state except life and accidental," and re-quired a deposit of $25,000 with the Treasurer. This favored life and accident companies by exempting them from those demands. In the code of 1868, we find section 2, chapter 34, the parent of our present section 2, chapter 34. "It shall not be lawful for any officer or agent of any foreign fire or marine in-surance company, directly or indirectly, to take risks or issue policies without procuring a certificate from the Auditor as hereinafter directed." This includes only fire and marine in-surance. So did the act of 1871, chapter 107. Two Acts of 1872-3, chapter 69 and chapter 221, and Acts of 1881, chapter 38, still include in the requirement of a certificate from the auditor only fire and marine insurance; but in 1882, (chapter 85) section 2, was amended to include life insurance companies. Chapter 34, Acts 1891 again amended section 2, but did not widen it as to the character of the companies. Thus we see that the Act of 1867 required of all insurance companies a de-posit, but exempted life and accident companies. The code of 1868 required of foreign insurance companies an invested capi-tal of $200,000 in section 2, chapter 34 of foreign insurance companies, but the section only named fire and marine compa-nies. Accident and life companies were still exempted. The acts later exempted those two until 1882, when life companies were put into the section, but accident companies were still favored as they were by the Act of 1867. The Legislature through several acts favored life and accident companies, and then saw proper to make life companies come under the re-quirements of section 2, but still left out accident companies. Surely it knew of accident companies. Through eight acts amending section 2 it was choice in selecting the companies it would bring under the demands of section 2. The letter of that

section does not include accident companies, and past acts show a purpose not to include them. Besides, there is reason for this. Fire, Marine and Life Insurance companies issue large policies calling for hundreds of millions of dollars in aggregate and only a few policies are of inconsiderable amount, while accident companies have small risks, and do not compare with the fire, marine or life companies either in aggregate of policies or in the amount of the several policies. The losses from them are incomparably smaller. Here we find a reason for difference.

But section 2 after requiring of all fire, marine and life insurance companies a certain certificate adds, "No foreign insurance company, or agent thereof, shall transact any business of insurance in this state unless such company is possessed of at least one hundred thousand dollars of actual capital invested in the 'stock or bonds  *  *  *  *  at the current market value at the date of such statement." It is said that this applies to all insurance companies and includes accident companies. Observe that the section opens with requiring a statement of the character, assets and other circumstances of only life, fire and marine insurance companies, and in immediate connection, it adds the obligation, as to foreign insurance companies, of having a certain capital. Why leave the words of the section a few lines above, in the opening words giving the companies to which the section relates, the subject of the section, and go off to find an accident, title or guaranty insurance company and apply this clause also to it? That clause makes this capital an element required for the issuance of the certificates, and that is the certificate required in the outset of this section only of life, fire and marine companies. This capital requirment is not an element participating in a distinct certificate. It is only one certificate with which the section deals. As the office of this clause is to add a prerequisite to the certificate as to foreign companies, we must relate it only to those companies required to have that certificate. The section demands a certificate by its words only of certain companies, specifies the requisites for it, and having done this section 3 requires the Auditor to issue that same certificate spoken of in the opening of section 2, that is after the "statement" is filed and evidence adduced of the invested capital, and in case it is a company of a state which requires a deposit of our companies,

there must be also evidence that a like deposit has been made here. It is the one certificate which the section speaks of, and that is required only of life, fire and marine companies by the letter of the section 2.

It is admitted that the "statement," distinctively so called, is required only of life, fire and marine companies. If so, accident companies do not have to file it. This tends to show that accident companies are not included. Note the words in section 2 "market value at the date of such statement." That state-ment is required only of life, fire and marine companies. It requires the investment only of them. Stress is placed in argument upon the provision in section 2 that the Auditor may investigate the condition of any insurance company, and if its condition is unsound, revoke its certificate. That does not broaden the scope of the section. That applies only where a certificate is required, and I repeat that there is but one certificate mentioned in the section, and that is the one required of life, fire and marine companies. If no statement is required of an accident company, then no certificate is required of it; for the filing of the statement is an element of the certificate or prerequisite. The same answer is given as to the feature authorizing the auditor to revoke a certificate where a company holding it has failed to pay a judgment. It applies only in those cases where a certificate is demanded by the statute. It may be that such powers over unsound accident, title, stock or other insurance should exist; but the Legislature has not yet provided for it

We are called by the brief to consider section 18, chapter 34, wherein it is provided that no agent shall make, renew or negotiate any insurance without "first obtaining the Auditor's certificate of authority as required by law," and subjecting him to penalty for so doing. It is said this requires a second certificate. Whether so or not, it has no force on the question in hand. But this section does not define a second certificate. It is the certificate "required by law;" that is, by other law, the one issued to the company under section 3. The only purpose of section 18 is to enforce the provision of section 2 requiring certain companies to have certificates of authority to insure. Insurance companies operate by officers and agents. If they are by punishment restrained from getting insurance

for authorized companies, the evil contemplated will be suppressed, that is the issue of insurance policies by companies which have no certificate of authority.   It is needless to cite authority to prove that an accident company is different from a life or fire or marine insurance company.   The difference is substantial.   We cannot accede to the position that this company is a life insurance because if death ensues it pays $60. It is not a life insurance company within the meaning of section 2, chapter 34.   We think that life, fire and marine insurance companies are the only ones contemplated by section 2.   In answer to a question, we do not think that life, fire or marine insurance companies obtaining a certificate under section 2, chapter 34, have also to comply with section 30, chapter 54, and get certificate under the latter section.

We conclude that accidnet insurance companies do not come under section 2, chapter 34 of the Code, so as to require the Auditor's certificate therein specified.   The Legislature has not yet so ordered.   It has not yet seen fit to require of them $100,-000 capital invested.   We cannot legislate.   We cannot amend the statute.

After writing the above I discover that section 13, chapter 34, was amended by chapter 107, Acts 1901, so as to place a fixed license tax on foreign accident insurance companies.   Until the act of 1901 they were not in that section by express specification.   That section says that if any company fails to make payment or report of business the Auditor shall not issue to the company the certificate mentioned in section 3 of chapter 34, and from this it may be argued that as foreign accident companies are brought under the license, they must obtain   the Auditor's certificate under section 2 just the same as life, fire and marine insurance companies, and have invested capital of $100,000.   To so hold we must amend section 2 by inserting the word "accident," and make it read, "It shall not be lawful for any officer or agent of any life, fire, marine or accident insurance company * * * * to take risks without the auditor's certificate."   We must thus amend the section by implication; we must do what the legislature did do; nothing short of this will bring such result.   The Legislature in 1901 selected certain sections of chapter 34 for amendment; but left section 2 untouched.   Shall we amend it by inserting that word.   The Leg--

islature put it in one section, but not in the other. We cannot thus amend when the Legislature having the matter in hand has not done so. We must say that it intended to leave section 2 stand, and must give it as left standing and section 13 as amended in 1901 each effect. Thus, we say that section 13 denies the auditor's certificate to those companies in default required by section 2 to have such certificate; but that such companies as are not required by section 2 to have the certificate are not meant by that clause. Those companies not reporting business for license tax or not paying it are under section 14 which puts them and their agents under penalty of not less than $100. nor more than $1,000. The Act of 1901 did not, insert accident companies in section 2, because it did not intend to require of them proof of $100,000 assets.

The next question: Is the petitioner entitled to a certificate from the Secretary of State under section 30, chapter 54 of the Code? We think it is. That section says: "Any corporation duly incorporated by the laws of any state or territory of the United States, or of the District of Columbia, or of any foreign country, may, unless it be otherwise expressly provided, hold property and transact business in this state upon complying with the requirments of this section, and not otherwise." The requirement is only that it file with the secretary of state a copy of its articles of association and of the law or authority under which it is incorporated. Then the Secretary issues a certificate of the fact of filing such documents, and this certificate operates by law to allow it to do its corporate business in this state. If however, the corporation is a railroad or other corporation doing business in this state as lessee of the works, franchise or property of another corporation, or person or otherwise, it must in addition to the document just mentioned file a paper sealed with the corporate seal accepting the provisions of section 30, and agreeing to be governed thereby. This is not required of any but such lessee corporation. The object of this provision is to prevent such lessee from escaping the liability imposed by that section on the plea that it is only a lessee. The section makes railroad corporations doing business in this state, as to property, works and operations, domestic corporations. It was the purpose to compel agreement to be so liable as a domestic corporation in demanding a corporate consent

from such lessee company. But this accident insurance company is not a lessee corporation operating works of another. The Legislature of 1893 considered that section 2, chapter 34, would not apply to guaranty companies as it put in a section making it apply to them. Code 1899, p. 121. What the Legislature ought to have done is one thing, what it did do is another. Only the Legislature can cure defects, a court cannot legislate.

Therefore we award the *mandamus.*

*Writ Granted.*

POFFENBARGER, JUDGE, (*dissenting*):

The Virginia Accident Insurance Company, a Virginia corporation, and clearly a foreign corporation within the meaning of the statutes of this State, asks for a peremptory writ of *mandamus,* commanding the Secretary of State to issue to it a certificate under section 30 of chapter 54 of the Code, authorizing it to do business in this State. This application is resisted by the Secretary of State on the grounds that said company is not entitled to a certificate under said section, and that he has no authority to issue the same, and that said company must obtain its certificate and authority to do business in this State from the auditor.

The solution of the question presented depends upon the construction of chapter 34 of the Code under which, if at all, accident insurance companies must obtain such authority from the auditor. Said company insists that only life, fire and marine insurance companies are subject to supervision by the auditor and required to obtain from him authority to do business. Whether accident insurance companies fall within the requirements of said chapter must be determined by reference to the several acts of the Legislature, commencing with section 8 of chapter 113 of the Acts of 1863, requiring, among other things, a license to any person to "act as agent for any foreign insurance company," and inflicting a penalty of not less than five nor more than fifty dollars for acting without such license. Section 55 of chapter 118 of the Acts of 1863 required every agent of any insurance company, incorporated by any other state or government, to return under oath to the assessor annually, the gross receipts of such agency. Section 16 of chap-

ter 123 of the Acts of 1863 imposed license taxes upon every agent of a foreign insurance company doing business within the State, the amount being fifty dollars for every such company for which the agent acted except in towns or cities containing a population of three thousand or more, and in such cities or towns, a tax of one hundred dollars per annum.

Chapter 33 of the Acts of 1864 may be regarded as the ground work of legislation in this State looking to the creation of a bureau for the supervision and control of insurance. That chapter contains 13 sections and expressly repeals the sections hereinbefore referred to as well as the 23rd and following sections of chapter 39 of the Code of Virginia. This chapter took out of the hands of the assessors of the various counties the licensing of the agents of foreign insurance companies, and placed the entire control and supervision of insurance companies and their agents in the hands of the auditor of the State. Section 1 of said chapter reads as follows: "Every domestic insurance and express company, and every person acting in this State as principal agent of any foreign insurance or express company, shall semi-annually make returns to the auditor as follows." Then follow section 2 showing what shall be returned; section 3, requiring the payment into the treasury of the State of a tax of three per cent on the amount of premiums so returned; section 4 prescribing the penalty for failure to make the returns and relieving said companies from the payment of any other taxes to the State and any county levy or school tax; section 5 prohibiting any foreign insurance company, after the first day of April, then next, from renewing any contract of insurance without having complied with the provisions of section 6; section 6, requiring the appointment of an attorney and consent and agreement that service of process upon him should be as effective as if duly served upon the company; section 7, requiring the power of attorney to be filed by the company in the office of the Secretary of State; section 8, providing that the power of attorney should be irrevocable as long as any liability of the company remained unsatisfied in the State; section 10, making service on the attorney equivalent to service on the principal; section 11, imposing a penalty of not less than twenty nor more than two hundred dollars upon the agent acting without having complied with the

fifth, sixth, seventh and eighth sections; and section 12, providing that every insurance company which had been or should be, incorporated by an act of the General Assembly of Virginia in force within this State, or under the act ·of the Legislature of this State passed October 26, 1863, "shall be deemed a domestic company within the meaning of this act, and every other insurance or express company, a foreign company."

An examination of chapter 34 of the present Code will show that it contains in some form and in some connection, the general plans and substantial provisions of said chapter 33 of the Acts of 1864, and plainly and unmistakably includes, when read in the light of said act of 1864, every foreign insurance company of any description whatever.

Recurring again' to previous legislation, we come to chapter 117 of the Acts of 1867, the first section of which reads as follows: "All insurance companies establishing agencies or doing business in this State, except life and accident insurance companies, shall pay to the State semi-annually, on the first day of July and January of each year, a tax of three per cent. upon the gross receipts of such companies during the previous six months of their business within the State." Section 2 requires such companies to deposit with the treasurer of the State $25,000. Section 3 imposes a penalty for non-compliance with the provisions of the act. The act contains no repeal clause. It probably relieves life and accident insurance companies from the payment of the tax imposed by chapter 33 of the Acts of 1864 by implication, and also from making the deposit, but it does not relieve or except them from other duties and liabilities imposed by the act of 1864, not included with the exceptions named by the act of 1867.

The next legislation on the subject is found in chapter 34 of the Code of 1868. Section one of said chapter is like the same section of the same chapter of the present Code, except for the addition of one word in the present section. Section 2 of said chapter, ·down to "life insurance companies associations" reads, in all substantial respects, like section 2 of the Code of 1868, except that in the Code of 1868 the word "foreign" was inserted in the first line after the words "agent of any," and the word "life" appearing in the first line of the present section was omitted, and except further that the capital

required was two hundred thousand dollars under the Code of 1868, while it is but one hundred thousand dollars in the present statute. Said section 2 of chapter 34 of the Code of 1868 contained a further provision as to how much capital should be in cash and required twenty-five thousand dollars to be deposited with the governor. The remaining provisions of said chapter of the Code of 1868 are very similar to some of those of chapter 34 of the present Code. In one significant respect it altered the act of 1864. It will be remembered that the act of 1864 required the power of attorney to be filed in the office of the Secretary of State. The Code of 1868 required, as does the present Code, that the certificate be filed in the Auditor's office. While it did not require from life and accident insurance companies the statement prescribed in section 2, either foreign or domestic, it did require that "every foreign insurance, telegraph and express company doing business in this State, or the agent or agents thereof, shall annually make returns to the Auditor as follows." Section 7. The present statute requires the same thing. Section 13 of chapter 34 of the Code of 1868 required a tax to be paid "by any foreign fire or marine insurance, telegraph or express company," in the first clause thereof, and by all others, including life insurance companies, in the remaining clauses. The tax on both life and accident insurance companies was clearly restored by chapter 34 of the Code of 1868.

Chapter 107 of the Acts of 1871 amended section 2 of chapter 34 of the Code of 1868, but not in any substantial or important particular. It made section 2 inconsistent with section 13 and to that extent modified said section 13. Chapter 69 of the Acts of 1872-73 again amended and re-enacted said section 2 of chapter 34 and expressly repealed so much of the act of 1871 and sections 3 and 13 of chapter 34 as were inconsistent or in conflict with said section as amended by the act of 1872-73. Section 2 of chapter 34 of the Code of 1868, before and after amendment by the act of 1871, made it unlawful for any officer or agent of any *"foreign* fire or marine insurance company," to do business in this State without having procured from the Auditor a certificate, &c. As amended by the act of 1872-73, said section made it unlawful for any officer or agent of *"any* fire or marine insurance company" to do busi-

ness as aforesaid, leaving out the word "foreign." It is to be observed that the change has been carried into the section as it stands now. All fire or marine insurance companies, whether domestic or foreign, are now, and have been since the act of 1872-73, required to render the statement prescribed in the first part of said section. The part of that section requiring such statement, which is not confined to foreign insurance companies of any kind, is immediately followed by this language: "And no *foreign* insurance company, or agent thereof, shall transact any business of insurance in this State, unless such company is possessed of at least one hundred thousand dollars of actual capital," &c. The change in the statute, in reference to the statement, and the omission to change the succeeding part of it prohibiting foreign insurance companies, without any express exception, from doing business in this State, except upon the conditions thereinafter named, clearly shows that the words "fire or marine insurance company," in the first part of the section was not intended by the Legislature to limit or qualify, as antecedent words, the words, "no foreign insurance company," found in the second part of the section after the requirement as to the statement and in reference to a wholly different matter, namely, the amount of assets required to enable a foreign insurance company to do business in this State. Said act of 1872-73, however, did not require the statement from life insurance companies, but in the second part of the section as amended by that act, imposing a three per cent tax of the gross amount of premiums received in this State for the previous year, upon "every foreign insurance company doing buisenss in this State," contained this *proviso*, that "any foreign life insurance company which shall invest in this State the whole amount of its net receipts from its business therein, shall pay only one-third of the aforesaid rates." This shows clearly that, while foreign life insurance companies were not included in that part of the statute requiring the statement to be made, they were included in the second part which imposed a tax upon them and required the fulfillment of certain conditions as to assets and the making of returns for taxation, thereby again emphasizing the entire separation and distinction of the second part of that section from the first part.

The next act is chapter 38 of the Acts of 1881, which again

amended and re-enacted said section 2. The amendment consisted principally of the elimination therefrom of certain provisions, not important to be considered in this connection. This was followed by chapter 85 of the Acts of 1882, amending and re-enacting the whole of chapter 34 of the Code of 1868. One change made in section 2 by this act is the insertion of life insurance companies among those from which the statement is required to be made. Several other changes were made in that section which need not be repeated here. By chapter 108 of the Acts of 1891, section 2 was again amended and re-enacted so as to read as it now appears in the Code of 1899.

From what has been stated it is very clear that, in its origin, as well as its progress down to the present time, all this legislation had, for one of its purposes, but perhaps its chief purpose, the obtaining of revenue from these corporations. It started as a revenue measure and is continued as a revenue measure. Clearly the second part of section 2 places all foreign insurance companies under the supervision and control of the auditor. Section 7 requires a return to the auditor by every foreign insurance company. Section 8 shows what returns a foreign insurance company shall make. It reads as follows: "If such returns be made on behalf of an insurance company, they shall show the amount of premiums on all insurance made, renewed or negotiated within this State, or on any subject of insurance within this State, on behalf of such company, during the period to which the said returns relate, including as well premiums uncollected as those which are paid." Section 11 shows when and for what period the returns shall be made, and with what degree of particularity the facts shall be stated. Section 12 authorizes the auditor to prescribe forms and regulations for carrying the provisions of the chapter into effect, and makes it the duty of every assessor to transmit to him a list of all the companies and agents doing business within the assessment district. What is the reason for all these requirements? The question is answered in the next section which reads, in part, as follows:

"At the time of making such return by *any foreign insurance,* telegraph or express company, the officer or agent making the same shall pay into the treasury of the State a tax of two per cent, on the gross amount of the premiums, or charges and

frieghts, or receipts for dispatches and messages, stated in the said return, which shall be in full of State taxes only."

What about domestic insurance companies? This is answered by the sixth section which says : "The property of domestic insurance, telegraph and express companies shall be assessed for taxation as other property in this State. But the stock notes of such company shall not be assessed; nor shall such notes or any part of them be considered a part of the indebtedness of the maker thereof, in listing his property for taxation."

It has been shown that the act of 1864 taxed all insurance companies without any distinction between foreign and domestic companies. The Act of 1867 probably exempted life and accident insurance companies from any taxation and required a deposit from all insurance companies except life and accident companies. Subsequent acts have clearly and unmistakably restored the tax upon life and accident insurance companies, both foreign and domestic.

It has been shown that originally the power of attorney executed by a foreign insurance company was required to be filed in the office of the secretary of state, but is now required to be filed in the auditor's office and there is no statutory provision which expressly gives to the secretary of state or his office any connection with, or control over, an existing insurance company.

The statement required to be made by life, fire and marine insurance companies was, at first, confined to foreign fire and marine insurance companies and made its first appearance in the Code of 1868. That has been modified so as to apply to life, fire and marine insurance companies, whether domestic or foreign. All must make that statement. Likewise the requirement as to assets to be possessed by a foreign insurance company made its first appearance in the Code of 1868 and has since been retained, except as to the amount of assets. In that, as first inserted no class of companies was included except insurance companies, and they were limited to foreign insurance companies. It said that no foreign insurance company should do business unless possessed of a certain amount of actual capital. Nothing but the most unsubstantial inference or implication could limit the words "no foreign insurance company," found in the second part of said section so as to mean foreign fire

and marine insurance company in the Code of 1868. If any such meaning was intended originally, the Legislature, in the Acts of 1872-73, clearly obliterated it and showed a contrary interpretation when it left the words "fire and marine insurance company" in the first part of the section and found it necessary to except life insurance companies in express terms so as to prevent their being compelled to pay the entire amount of tax. This clearly shows that the Legislature never did intend the statute to mean what it is claimed to mean by the plaintiff here. No rule of construction in the absence of such express legislative -interpretation, will justify the construction contended for by the petitioner. Whatever may be said of the statute as it stood in the Code of 1868, no such connection and limitation as is contended for here can be made in the present condition of that section. Of that part requiring the statement to be made, the section applies to all life, fire and marine insurance companies. Of that part containing the requirement as to assets, it is limited to foreign insurance companies, so that it cannot have the same meaning as in the former part of the section, even if it could have had such meaning when the former part was limited to foreign companies. This legislation having been commenced for revenue to be derived from all insurance companies, and other provisions having been engrafted upon it, partly for the purpose of enforcing the payment of revenue and partly for the purpose of supervision, and a virtual department of insurance created in the auditor's office, through which the payment of taxes is to be enforced and supervision exercised, and the Legislature having manifested in this legislation a clear intention to extend the supervisory power of the State over all insurance companies, no rule of mere composition or grammatical construction ought to be permitted to overcome and defeat that intention, as well as to narrow and cut down, the express language of the statute. The rule of construction of deeds, wills, statutes and constitutions, differs from that of composition, under which a general and indefinite expression is limited in meaning and effect by definite words antecedently used in the same connection. In law the. rule of construction looks not only to what has gone before but to what follows and consequences as well. It compels consideration of the whole instrument, so that every part of it, if

possible, may take effect; and that every word in it may operate in some way.  The maxim applied by Blackstone in *"Nam ex antecentibus et consequentibus fit optima interpretatio*.  Not only must every word have some effect, if possible, but its full effect, if not inconsistent with other provisions.  Even the rule of grammar under which general and indefinite words are limited by definite antecedent words is not applicable to this case.  Can it be said that "no foreign insurance company" is uncertain and indefinite?  Most assuredly it is not.  It is general, but its meaning not the least uncertain and it cannot be said to be definite so that its meaning must be obtained from antecedent words.

Do the words "at the date of such statement," found in the clause providing that "no foreign insurance company, or agent thereof, shall transact any business of insurance," &c., demand a different construction?  Plainly these words refer to the statement required in the first part of the section, and it is urged that their presence is conclusive evidence of legislative intent to narrow the words "no foreign insurance" so as to mean "no foreign life, fire or marine insurance company."  Such may have been the original design and proper construction.  As stated, the requirement of a statement was first made in the Code of 1868, and applied only to "foreign fire and marine" insurance companies, but the chapter required payment of taxes by all foreign insurance companies.  See sections 7 to 13, inclusive. Chapter 34, Code, 1868, section 7, requires "every foreign insurance" company to make return for taxation.  Section 13 requires payment of taxes by every "foreign fire or marine" insurance company, also by "any other insurance company except life insurance companies," and finally "by a life insurance company," prescribing different rates of taxation for each class, namely: four, three and two per cent, respectively.  Since 1868 sections 2, 3 and 13 of chapter 34 have been radically changed, without striking out the words "at the date of such statement."  Among others this was inserted by chapter 69, Acts of 1872-73:  "When, by the laws of any other state, any deposits of money or of other securities, or other obligations or prohibitions, are imposed or would be imposed upon insurance companies of this State, doing, or that might seek to do business in such other

state, or upon their agents therein, so long as such laws continue in force, the same obiligations and prohibition, of whatever kind, shall be imposed upon all insurance companies of such other state doing business within this State, or upon their agents here." When this was inserted, the first part of section 2 required the statement to be made only by fire and marine insurance companies. Shall the words "all insurance companies of such other state" in the new provision be so restricted? Why? It is later in date, and if there is inconsistency or repugnance, shall not the later expression of legislative will control, and if need be, broaden the first and older part of the section? Is not that a well settled rule of construction?

Another new provision inserted by the Act of 1872-73 is this:

"Every foreign insurance company doing business in this state *at the time of the making of the annual statement as required by law,* shall pay into the state treasury, as taxes, three per cent. of the gross amount of premiums received in this state during the previous year, taking duplicate receipts therefor, one of which shall be filed with the auditor; and upon the filing of said receipts, and not till then, the auditor shall issue the annual certificate as provided by law, and the said sum of three per cent. shall be in full of state taxes only: Provided, that any foreign *life* insurance company which shall invest in this state the whole amount of its net receipts from its business therein, shall pay only one third of the said rates." Are the words, "every foreign insurance company,". found in this new provision of section 2, limited in meaning to fire and marine insurance companies by force of the old language in the first clause of the section? If so, why the necessity or reason for the proviso as to *life* insurance companies? Although not so required by the first clause, did not this new clause clearly mean that foreign life insurance companies should make the annual statement and procure the certificate? If so, did not the same clause require all other foreign insurance companies to do the same thing? If, to effectuate this new and later requirement, the old language of the first part of the section must be broadened, what harm results or violence is done?

"Whether the prior statute is recent or of long standing *it must yield if there is conflict.* But with a view to ascertain the in-

tent of the legislation on a given subject at any time *it must all be considered, whether it has continued in force or been modified by successive changes.* Suth. Stat. Const. Sec. 283.

All these new provisions and changes and others hereafter to be noted make manifest an intent which cannot be restrained or cut out by referring such general words as "no foreign insurance company," "every foreign insurance company," "any insurance company" and the like, to the antecedent words "life, fire and marine" insurance companies, as *ejusdem generis,* for they occur in new and distinct provisions which by their express terms show a contrary intention.

On this subject Sutherland on Statutory Construction, section 279, says: "In cases coming within the reach of the principle just illustrated, general words are read not according to their natural and usual sense, but are restricted to persons and things of the same kind or genius as those just mentioned; they are construed according to the more explicit context. This rule can be used only as an aid in ascertaining the legislative intent, and *not for the purpose of controling the intention or of confining the operation of the statute within narrower limits than was intended by the law maker.* It affords a mere suggestion to the judicial mind that where it clearly appears that the law maker was thinking of a particular class of persons or objects, his words of more general description may not have been intended to embrace any other than those within the class. The suggestion is one of common sense. Other rules of constration are equally potent, *especially the primary rule which suggests that the intent of the legislature is to be found in the ordinary meaning of the words of the statute.* The sense in which general words, or any words, are intended to be used, furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning will be given, according as the intention is thus indicated. *To deny any word or phrase its known and natural meaning in any instance, the court ought to be quite sure that they are following the legislative intention. Hence, though a general term follows specific words, it will not be restricted by them when the object of the act and the intention is that the general word shall be understood in its ordinary sense."*

Having ascertained that this rule, restraining general words to antecedent specific words never controls, but yields to, clearly apparent legislative intent, and that where the provisions of a prior statute are in conflict with those of a later one, the former must yield, how is it possible to say the words "at the date of such statement" can stand and control the clearly expressed intent of the legislature that every foreign insurance company shall procure from the auditor a certificate to do  business? Take the following clause found in section 2 of chapter 34, "no person shall act as agent or broker in the solicitation or application for a policy of insurance, for *any company or corporation referred to in this act, without first procuring a certificate of authority from the auditor.*" Can there be any doubt that it applies to agents of all insurance companies? Are not all classes of insurance companies, domestic and foreign mentioned in the chapter? Are not life insurance companies, without any designation or limitation, mentioned in the very section in which the clause is found? All the provisions of the entire chapter relate to the same general subjects; they have sprung into being at different times within the past forty years; they are, or were, acts *in pari materia;* they have been from time to time, combined, arranged, altered, re-arranged, and finally put into chapter 34 of the Code; and the legislative intent must be gathered from them all, and must prevail. The application of any one narrow rule of construction, or a construction based upon a single clause, is not only violative of the rules of statutory construction, but injurious to the state and the public, as it will operate to deprive the state of its revenues and expose the people to the fraudulent or dangerous practices and, operations of unsound insurance companies.

I do not intend to say here that all insurance companies are required to have $100,000.00 of capital to enable them to do business in this state. That question is not presented. No application has been made to the auditor for a certificate to do business, and the petitioner denies that it is required to have such certificate, or that its agents must obtain such certificates, If, on such application, the auditor should refuse it on the ground of insufficiency of assets, the question may come before this Court for decision. However it may be as to the requirement concerning assets or capital, I think there cannot be any

doubt that all foreign insurance companies must pay taxes, are subject to the right and duty of the auditor to examine into their conditions and affairs, and must procure the certificate of authority to do business in this state.

The provision for the issuance of a certificate by the auditor authorizing insurance companies and their agents to do business in the state is found for the first time in the Code of 1868, it having been put in at the same time that the requirements as to statement and assets were inserted, and has ever since been retained in the statute, and no foreign insurance company of any kind or character is entitled to do business with such a certificate. Under the Code of 1868, no provision was made for any certificate to any domestic insurance company, and neither sections 2 nor 3 apply in any manner, shape or form to anything but foreign insurance companies. In 1882 when the whole chapter was re-enacted, it was provided that "Upon any domestic company complying with what is required of it by the preceding section, the auditor shall issue a like certificate thereof." This was not done without reason. Up until that time the auditor was authorized to examine into the condition and affairs of *foreign insurance companies only.* The act of 1882 authorized him to examine into the condition and affairs of *any* insurance company doing business in this state. Here, it appears by express language and the cutting out and insertion of words and clauses by way of amendment that section 2 and 3 were not intended to be limited to the companies mentioned in the first part of the section only. These changes made in the two sections in 1872-73 are retained in the statute as it is found in the Code today. Not only in express terms, but by the manifest intent of the legislature as read in the nature of the provisions made and the whole course and history of antecedent legislation, it clearly appears that these two sections are designed to give to the auditor supervision and control, according to the provisions of the sections, over all insurance companies doing business in this State, of whatever size, character or jurisdiction, for by section 2 he may not only inquire into the condition and affairs of any insurance company doing business in this State, but "whenever it shall appear to the satisfaction of said auditor that the affairs of any such company are in an unsound condition, he shall revoke the certificate granted in behalf of such

company and shall cause a notification thereof to be published in some newspaper of general circulation published at the capital of this State, *and the agent or agents of such company are, on and after such notice, required to discontinue the issuing of any policy or of the renewal of any previously issued.*" Said section 2 was amended in important respects by chapter 221, acts 18872-73, and a new section added,

It may be said that this argument is without force for the reason that section 3 says such companies may acquire a certificate from the auditor and not that they shall have such certificate. But if some other part of the statute says they shall not do business without it, the certificate becomes essential, and its acquirement a condition precedent to the doing of business. They are not compelled to take it, but they are not allowed to do business without it. This question is set at rest in express and emphatic language as to all insurance companies, domestic and, foreign in section 2 where it is said, "no person shall act as agent or broker in the solicitation or application for a policy of insurance, for any company or corporation referred to in this act, without first procuring a certificate of authority from the auditor. Said certificate of authority must be renewed annually on the first day of January, or within sixty days thereafter."

Further light is thrown upon this question by the history of the provisions found in section 18 of chapter 34. That section came to life in 1868, along with the provisions as to the statement and the assets and the certificate to do business, and like them was confined to the officers and agents of foreign insurance companies, who were prohibited from making, renewing or negotiating in this state any insurance or contracting for insurance on behalf of such company unless the company had complied with the 15th and 16th sections of the chapter, in reference to the appointment of an attorney and service of process. In the acts of 1872-73 which struck the word "foreign" out of the first part of section 2, there was added something that was not contained in section 18, nor any other part of chapter 34, namely, that "no officer or agent of a foreign insurance company shall make, renew or negotiate in this State any insurance or contract for insurance on behalf of such company, or transact any business for such company, directly or indirectly, without first obtaining the auditor's certificate of authority as re-

quired by law; and this applies to all persons engaged in any manner in soliciting risks, issuing or obtaining the issue of policies, selling tickets of insurance, or otherwise doing the business of insurance, either by direct appointment from the company or as such agent." When the Act of 1882 was passed in an effort to systemize the law on the subject, and when it was provided that certificates should be issued to domestic as well as foreign insurance companies, and the auditor was authorized to examine into the condition and affairs of any insurance company, the provision added to section 2 by the Acts of 1872-73 and just quoted was somewhat changed in its phraseology, namely, by striking out the word "foreign" and embodied in section 18 of the chapter where it is now found, and expressly made to include the agents of any insurance company doing business within this State.

Plainly, the certificate prescribed and authorized by section 3 of chapter 34 is designed for two purposes, in that it may be withheld or revoked on either of two grounds for the purpose of enforcing compliance with the statutory regulations. Whether, when first provided for, it was intended as a weapon or instrument by which to exclude unsound insurance companies by way of protection to the public, for which purpose it is still used and intended, or to enforce the payment of taxes by foreign insurance companies, it is unnecessary to inquire. Certainly it is, by express provision of the statute, authorized to be used for the latter purpose as chapter 34 now stands. By section 13, requiring payment of taxes by foreign insurance companies to the auditor, it is further provided that "Should any company fail to make such payment and file such receipt, the auditor shall not issue to such company the certificate mentioned in the third section of this chapter so long as such failure may continue." That is the only direct remedy to be found in the Code of West Virginia by which to enforce payment of the taxes by foreign insurance companies. There can be no remedy for the collection of taxes except such as is given by the statute and there is none other. Unless, therefore, foreign insurance companies are required to take such certificate, there is no remedy by which they can be compelled to pay the taxes. Are they not required to pay taxes? Does not the statute expressly require them to pay taxes? The answer to the question is found in the provisions of the

statute hereinbefore quoted, expressly requiring every foreign insurance company to pay taxes into the State treasury. It is true that certain penalties are prescribed for the failure to make the return and payment of the taxes, but that is not a remedy for the collection of taxes. Conditions may be imagined under which an insurance company might well afford to pay the penalty fixed by the statute rather than to pay the taxes. The taxes might be far in excess of the forfeiture for the failure to pay. Surely, the Legislature never intended to impose a tax upon foreign insurance companies—every insurance company—without providing a remedy for the collection of the taxes.

Go back and trace up the history of the remedy for the collection of taxes from foreign insurance companies. Section 3 of chapter 33 of the Acts of 1864 required the return to be made and the tax to be paid at the same time, and section 4 of said chapter inflicted a penalty for failure to make the return or nonpayment of the tax. No certificate was required. The Act of 1867 gave a remedy by action of debt to recover the penalty. The next legislation on the subject is found in the Code of 1868, section 13 of chapter 34. That section provided that, at the time of making the return, the tax should be paid by "foreign fire or marine insurance companies" and then says "And at the time of making such return by any other insurance company, except life insurance companies, the officer or agent making the same shall pay into the treasury of the state a tax of three per cent. on the amount of premiums mentioned in said return; and at the time of making such a return by a life insurance company, the officer or agent making the same shall pay into the treasury a tax of two per cent. on the amount, of premiums mentioned in said return." , The express language of this section did not require the withholding of the certificate for non-payment of tax. When this section was amended and re-enacted by the Act of 1882, it required "any foreign insurance company" to pay the tax at the time the return was made and then said that, if such company failed to make such payment the auditor should not issue to such company the certificate mentioned in the third section of the chapter so long as such failure continued. There, for the first time, the withholding of the certificate was made the remedy for

the collection of the tax from foreign insurance companies, and such use has been from that time, and still is, continued.

The amendment of section 13 of chapter 34 of the code by chapter 107 of the acts of 1901, but confirms the views hereinbefore expressed. Prior to the amendment section 13 required all foreign insurance companies, except "foreign life stock" insurance companies to pay taxes at the rate of two per cent. on the gross amount of premiums. It and other sections were so amended as to require payment of taxes on the risks taken instead of on the premiums, and as to classify the companies and prescribe different rates of taxation, making fire companies pay one fourth of a mill on each dollar, life and accident companies one and one-half mills on each dollar, and miscellaneous companies one-tenth of a mill on each dollar. This separation and classification, resulting in the naming of *"accident"* companies as subject to taxation, confirms the view that the legislature itself considered such companies as included in the words "foreign insurance" companies used in the sections imposing taxation.

Further pursuit of this question of legislative intent is unnecessary. Every recurrence to the statutes and re-examination of them reveals changes by elimination of words, insertion of words, and re-arrangements, all indicating the same thing and setting the matter of legislative intent entirely beyond question. All insurance companies, domestic and foreign, except some that are expressly exempted, and possibly some mentioned in chapter 55 of the Code, and those provided for by chapter 28 of the Acts of 1891, are clearly made subject to supervision, examination and taxation and must procure their certificates to do business from the auditor.

For domestic mutual fire insurance companies organized under chapter 55 of the Code, and title and trust companies provided for by chapter 28 of the Acts of 1891, Code p. 118, no express provision made in those chapters, and whether chapter 34 of the Code applies to them is a question which does not arise here, and cannot be decided. Companies formed for mutual relief and for insuring lives on the assessment plan, mentioned in section 27a of chapter 55 of the Code, are classified into domestic and foreign companies. Whether the former are required to obtain certificates to do business is not expressly stated in that section, and whether it can be so construed and wheth-

er they are covered by chapter 34 cannot be decided now. Foreign companies of that kind are expressly required to obtain certificates and made subjects to examination. Fraternal societies securing members through the lodge system without agents are expressly exempted by sub-section 10 of section 27*a* of chapter 55, Code. Chapter 28, Acts 1891, providing for incorporation of title and trust companies, does not require of them such certificate, nor subject them to the examination prescribed for insurance companies. Foreign fidelity and guaranty companies are expressly required to comply with all provisions of law applicable to fire insurance companies.

Having concluded that foreign accident insurance companies must procure certificates from the auditor, it remains to inquire whether they must also procure certificates under section 30 of chapter 54 of the Code. Apparently, that would be not only useless but inconsistent and likely lead to confusion. One certificate to do business ought to suffice it would seem, and besides that, a company holding a certificate under chapter 54 and another under chapter 34, might have the latter revoked by the auditor and still claim the right to act under the other certificate. From these considerations, I conclude that a certificate from the secretary of state is unnecessary, and need not be issued if demanded, as it would be alone ineffectual to authorize an insurance company to do business in the State. Chapter 34 makes special provision for such companies and is inconsistent with section 30 of chapter 54, which is general in its terms.

For reasons stated the peremptory writ ought to be refused, the *mandamus nisi* quashed and the petition dismissed.